Billy ROSE, Ray Henderson and Mel Torshin, as Executor of the Estate of Mort Dixon, Plaintiffs,

v.

BOURNE, INC., Defendant.

United States District Court
S. D. New York.
Sept. 15, 1959.

Schulman & Stern, New York City, John Schulman, Lloyd I. Isler, Martin Bressler, New York City, of counsel, for plaintiffs.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, Walter S. Beck, Simon Rose, Albert F. Smith, New York City, of counsel, for defendant.

DIMOCK, District Judge.

This is an action which originated as plaintiffs' suit for copyright infringement. Plaintiffs have suffered a voluntary dismissal of their claim without prejudice, D.C., 172 F.Supp. 536, and the trial has proceeded upon defendant's counterclaim for a declaratory judgment. The controversy involves the ownership of the renewal of the copyright of a musical composition, "That Old Gang of Mine". The three composers of this were the two plaintiffs who sue individually and the testator of the one who sues as executor. The issue to be tried was framed by the court as follows:

"[T]he defendant's claim that it is the legal owner of the copyright as renewed, or that the defendant is the legal owner subject only to the filing by it of an assignment in the names of plaintiffs in the copyright office which defendant has an irrevocable right to do despite any objection by plaintiffs."

Plaintiffs, hereinafter referred to for convenience as "the composers", maintain (1) that the instrument under which defendant claims did not constitute a present assignment of the future right of the renewal expectancy, and (2) that, even if the instrument constituted a present assignment, inadequacy of consideration for the assignment and uncontemplated changes in the music business preclude a declaration that the publisher is the legal owner either absolutely or subject to the filing by it of an assignment in the names of the plaintiffs.

On April 19, 1923, the authors executed an instrument which purported to sell to the defendant publisher, then known as Irving Berlin, Inc., the musical composition entitled "That Old Gang of Mine". The publisher proceeded to exploit the song and paid royalties to the composers which amounted, between 1923 and 1952, to $35,341.51. On April 23, 1923, the publisher registered the song in the Copyright Office as an unpublished work and on May 17, 1923, registered it as a published one.

■ The original copyright would have expired on April 23, 1951, twenty-eight years from April 23, 1923, the date of its registration as an unpublished work. Rules and Regulations Copyright Office § 202.17(a), 17 U.S.Code Appendix; Marx v. United States, 9 Cir., 96 F.2d 204.

On April 25, 1950, at the beginning of the final year of the original copyright term, the composers caused to be filed in the Copyright Office an application for the renewal of the copyright as an unpublished work and the application was registered. Later, on the same day, the publisher caused to be filed in the copyright office an application for the renewal of the copyright as an unpublished work but, in view of the earlier filing, it was not registered.

On May 16, 1950, the publisher caused to be filed in the copyright office an application for renewal of the copyright as a published work and the application was registered. On May 17, 1950, the composers caused to be filed in the Copyright Office an application for renewal of the copyright as a published work and, in spite of the earlier filing by the publisher, the application was registered.

All of the composers were still alive at the time of these filings.

The publisher had caused the original instrument of April 19, 1923, to be recorded in the Copyright Office on November 11, 1943, as an assignment of copyright. On May 25, 1950, after the filing and registration of the applications for renewal, the publisher again caused the original instrument of April 19, 1923, to be recorded.

■ On these facts my conclusion is that the original instrument of April 19, 1923, was effective as a present assignment of the expectancy of the renewal.

The first paragraph of the original instrument of April 19, 1923, read as follows, the composers being collectively designated as "the composer":

"1. The COMPOSER hereby sells, assigns, transfers and delivers to the PUBLISHER, its successors and assigns, the original musical composition written and composed by Billy Rose, Mort Dixon and Ray Henderson and bearing the title of THAT OLD GANG OF MINE including the title, words and music thereof, TO HAVE AND TO HOLD the same absolutely unto the PUBLISHER, its successors and assigns forever, together with all rights therein, or any copyrights now subsisting, for all Countries, that the COMPOSER now has or may be entitled to or that he hereafter could or might secure if these presents had not been made, including the publishing rights, the performing rights, the rights to use the same for mechanical reproduction, the right to make, publish and perform any arrangement or adaptation of the same, and all copyrights and the rights to secure copyrights and extensions and renewals of copyrights in the same, or in any arrangements or adaptations thereof."

■ The third paragraph, copied in the margin,[1] provided that as consideration the publisher would pay royalties on certain uses of the composition.

1. "3. IN CONSIDERATION hereof and in reliance upon the truth of each and every representation by the COMPOSER herein made, the PUBLISHER agrees to pay to the COMPOSER the following royalties, to wit:

"(a) Two (2) cents upon each and every complete printed pianoforte copy of the said work sold by the PUBLISHER in the United States and Canada only. It is, however, distinctly agreed and understood that in the event the PUBLISHER sells the printed pianoforte copy of the said work for less than 15 cents per copy, the COMPOSER agrees to accept as royalties due him two-thirds of the royalties above specified.

"(b) And the COMPOSER agrees that the PUBLISHER shall be under no obligation to pay any other sum whatsoever except as in this agreement provided and that no royalties shall be paid upon the following: complimentary copies; copies sold but not paid for; copies sold and returned to the PUBLISHER; copies sold or given away as

From the uses on which royalties were to be paid foreign sales and foreign mechanical recordings were, among others, expressly excluded. Such an agreement constitutes valid consideration. See Edward B. Marks Music Corp. v. Charles K. Harris Music Pub. Co., 2 Cir., 255 F.2d 518, 522, certiorari denied 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed.2d 69.

The composers contend that, so far as renewal of copyright is concerned, the original instrument did no more than give to the publisher the right to go into a court of equity and compel the composers to take steps to vest the publisher with title to the copyright as renewed. This claim is based upon the language in the enumeration of rights sold: "all copyrights and the rights to secure copyrights and extensions and renewals of copyrights in the same". The composers construe this language as effecting a sale of the right to secure a renewal of the copyright rather than a sale of the renewal expectancy itself. They go on to argue that the right to secure a renewal can be exercised only by a decree in equity working upon the composers.

The exercise of the right of an assignee of a copyright to secure a renewal thereof does not require cooperation of the composer. There is no distinction between the assignment of the right to secure a renewal and the assignment of the renewal expectancy itself. The expectancy cannot be reduced to possession except by the exercise of the right to renewal and that right may be exercised by the assignee all by himself.

During the composer's lifetime and before the final year of the term of the original copyright, the expectancy of the renewal of the copyright is like the interest of one who is entitled to a remainder after a term of years provided he outlives the term. The composer can effectively assign the expectancy. Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055. Yet, if the composer dies prior to the final year of the original term, the assignee's expectancy is defeated and the right to renewal vests in the widow, widower or children of the composer or, in default of them, the composer's ex-

new issues or for advertising purposes; professional copies; copies included in folios or books or published in newspapers, magazines or other periodicals; copies sold in foreign countries or mechanical royalties collected therein; band, orchestra, medley or other arrangements of or containing said work or any part thereof.

"The PUBLISHER will pay to the COMPOSER a sum equal to one-third of any and all royalties that the PUBLISHER shall actually receive from the use of the said musical composition for mechanical reproduction less one-third cost of collection under the license of the PUBLISHER in the form of player rolls (excluding word rolls), records, discs, or other devices for the mechanical reproduction of the said musical composition. With respect to all word rolls the PUBLISHER agrees to pay to the COMPOSER in lieu of the foregoing mechanical royalty; the same rate of royalty provided to be paid for printed pianoforte copies, for the printing of the words upon the player word roll, and one-third of 2c for each roll to represent the mechanical reproduction, which said

royalty is to cover both the mechanical player roll and the words printed thereon.

"Whenever the said composition or any part thereof shall be used by the Manufacturer of any mechanical reproducing device in connection with any other musical composition or part thereof for the purpose of recording said compositions or parts thereof as a medley, the PUBLISHER shall pay to the COMPOSER a royalty in lieu of the royalty hereinbefore specified as mechanical royalty to be determined as follows: The sum actually received by the PUBLISHER by reason of the mechanical reproduction of said medley shall be divided among and allocated to the compositions composing said medley in the proportion in which said compositions appear in said medley; and in determining such proportion the verse of any composition shall count as one part and the chorus as one part and each repitition of either verse or chorus shall count as one part and the COMPOSER shall be entitled to a sum equal to one-third of the moneys so allocated to the composition the subject of this contract."

ecutors or next of kin. Section 24 of the Copyright Act, 17 U.S.Code § 24, provides with respect to the type of literary property here involved, as follows:

"[T]he author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright."

■■ Unlike the original copyright, the renewal is created, not by publication with a claim to the copyright, but by registration of an application for renewal in the Copyright Office. Such an application cannot be validly made until the last year of the original term of the copyright so that, until that time, no one can have anything more than the "right to secure" a renewal. It will be recalled that that is exactly what the composers say the original instrument of April 19, 1923, purports to give the publisher. The assignee needs the help of no one to secure the renewal. It is true that the application for the renewal must be made in the name of the author or composer. 28 Op.Attys.Gen. 162; 17 U.S.Code Appendix, § 202.17(b). Nevertheless, the assignment of the expectancy implies a power of attorney in the assignee to make the application in the name of the author or composer. Rossiter v. Vogel, 2 Cir., 134 F.2d 908.

■■ It must be conceded that, under the statute and the Attorney General's opinion and the rules of the Copyright Office, the application registered in the Copyright Office must bear the name of the author rather than the assignee. Yet it necessarily follows from the decision of the United States Supreme Court in Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055, supra, that the renewal belongs to the assignee even though the application has not been made in the assignee's name. Unless defective under the special rule as to expectancies, to which reference will be made later, the title of the assignee is complete and perfect at the instant the application in the name of the author is registered. The registry of the application in the Copyright Office does not purport to show the ownership of the renewal. The Registrar of Copyrights has no way of learning from the application whether it has been filed by the author or by his assignee. Title depends not upon the form of registration but upon the actual ownership of the copyright as renewed. For all that appears on the record, title may reside either in the author or in an assignee named in the title assignment from him.

■ The composers contend that by virtue of the registration, on April 25, 1950, of the renewal application which they made in their own names they became the owners of the copyright as renewed. It is true that the copyright was renewed by virtue of the registration of the application but the ownership of the copyright as renewed was not determined thereby.

■ While the assignee of the expectancy of the renewal of a copyright may, under section 30 of the Copyright Act, 17 U.S.C. § 30, record his assignment, Rossiter v. Vogel, 2 Cir., 134 F.2d 908, supra, that recordation is not essential to his title although, if made within the prescribed period after its execution, it will protect the recording assignee against any subsequent assignee. Thus the execution and recording of assignments to the publisher in the name of the composers would not create a legal ownership in the publication that did not exist already.

As I have decided above, if the assignment had been an assignment of anything except an expectancy, ownership of the renewal right would have vested in the publisher at the moment of its crea-

tion. The case of Rossiter v. Vogel, 2 Cir., 148 F.2d 292, indicates, however, that the rule is different where an expectancy is involved. There the holder of a prior assignment which covered the renewal expectancy of a copyright sought an injunction against the holder of a subsequent assignment. The court denied relief to the plaintiff on the ground that he had given no consideration for his assignment. The court said, at page 293:

> "Under our earlier decision the assignment, if valid, would be treated as a present assignment of a future right. Hence the issue tendered was not the bare legal validity of the instrument, but whether defendants had established their defenses of lack of equity, justifying a court of equity in granting aid which was necessary to make the assignment ultimately effective."

Evidently legal validity is not enough to substantiate a present assignment of a future right. I take it, therefore, that the publisher, by tendering the issue of ownership, opens the question whether its title is such as would be supported by a court of equity.

 Pomeroy on Equity Jurisprudence, 5th Ed., § 953a, p. 783, says that the burden rests upon the purchaser to show affirmatively the perfect fairness of the contract and that a full and adequate consideration was paid. The author is there dealing with contracts made by expectants during the lifetime of their ancestors or life tenants. The only example of the setting aside of an assignment of an expectancy of a copyright renewal that we have is the above mentioned Rossiter v. Vogel, 2 Cir., 148 F.2d 292, where the assignment was made without any consideration. While there need not be a complete absence of consideration to justify such a result the consideration must at least be inadequate. Here the publisher assumed the burden of showing that the consideration was not inadequate and introduced evidence that the terms of the instrument of April 19, 1923, were quite usual

in the music business at that time. The composers made no attempt to controvert that but said that the consideration has become inadequate and the contract inequitable as a result of uncontemplated changes which have taken place in the business and have enabled the publisher to make profits out of uses of the song which, under the terms of the instrument of April 19, 1923, form no basis for royalty payments. The principal changes in the music business on which the composers base their claim are the introduction of synchronization rights for motion pictures, electrical transcriptions and synchronization rights for television. Film synchronization rights and electrical transcriptions have been treated as "mechanical reproductions" within the terms of the instrument of April 19, 1923, and royalties have been paid accordingly so that there is considerable doubt as to the factual basis of the composers' claim. It is clear, however, that even if the facts were as claimed the transaction would still stand. As was said by Pomeroy in a footnote to his discussion of expectancies above referred to, footnote 11, p. 784, "Inadequacy of consideration resulting from a subsequent event does not render the transaction voidable, if the consideration was adequate, although conjectural, at the time of the transfer", citing In re Richardson's Estate, 236 Pa. 136, 84 A. 670. The composers therefore do not come within the rule for relief of expectants.

 For still another reason, however, the assignment of the expectancy of renewal here must remain in full force and effect. The publisher proved that it had exploited the song for thirty years and had paid the composers $35,349.51. The composers offered no evidence of the adjustments necessary to accomplish a complete rescission at this late date. By the original bargain the composer assigned to the producer all of their rights in the song including, among others, their right to an original copyright and their expectancy in a renewal copyright. The publisher, on its part, agreed to make

certain royalty payments. The royalty payments were in no way related to the copyright or the renewal. Indeed, there was no provision that the publisher would be relieved of the obligation to pay royalties if and when the song became the property of the public.

The composers' only answer to this point is completely inadequate. They say that a copyright renewal creates a new estate and "[t]o acquire an interest in that new estate it was incumbent upon the defendant to provide an equitable contract, one which would provide adequate consideration for the renewal term when it came into being." That is merely a repetition of the point that there was no present assignment of the expectancy and the point that the consideration was inadequate. As held above, the expectancy was, with other rights, the subject of a present assignment for an adequate consideration which was not allocated among the several rights. It will not do to follow the composers' suggestion and deprive the publisher of the copyright as renewed without any adjustment. That would be to make a contract to which the publisher had never assented. The publisher is entitled to all of the rights for which he bargained or, if the composers are entitled to relief, to have the bargain completely rescinded.

 Not only does lack of testimony as to the necessary adjustments preclude complete rescission but it is barred by the laches of the composers. As stated above, the principal changes in the music business on which they base their claim are the introduction of synchronization rights for motion pictures, electrical transcriptions, and synchronization rights for television. The first of these came into use in 1927, the second in 1930 and the third in 1932. It was not until May 29, 1953, that the composers began this action and not until July 1, 1953, that they interposed the defense that enforcement of the assignment would be inequitable.

 Defendant asks leave to apply on affidavits for an allowance of counsel fees pursuant to section 116 of the Copyright Act, 17 U.S.C. § 116. A previous application was made by defendant when I gave leave to plaintiffs to suffer a voluntary dismissal of their complaint but reinstated defendant's present counterclaim which it had previously abandoned. Plaintiffs had offered to discontinue the action with prejudice but defendant, instead of accepting that plea, insisted upon determination of the question involved in the case, with findings which would be effective by way of collateral estoppel in other litigation. I thus said that the litigation was being continued for the benefit of defendant and all of the work that defendant's attorneys had done up to that point would enure to that benefit. I therefore denied the application by defendant for counsel fees against plaintiffs but without prejudice to a similar application upon the conclusion of the whole case. Defendant has finally prevailed and such an application is now before me. Counsel fees may properly be awarded where a party seeks a declaratory judgment with ·respect to the ownership of a renewed copyright. Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 2 Cir., 161 F.2d 406, 410. The purpose of the award of counsel fees in copyright cases is as much to penalize the losing party as to compensate the prevailing party. I cannot say that plaintiffs ought to be penalized for seeking a determination of the effect in their situation of the expectancy doctrine applied in Rossiter v. Vogel, 2 Cir., 148 F.2d 292, supra. On the other hand, plaintiffs' refusal to accept the decision of the Supreme Court in Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055, supra, was frivolous. Moreover, defendant is entitled to counsel fees and expenses involved in preparing to meet plaintiffs' claim that defendant had failed to carry out its obligations under the original instrument of April 19, 1923, which was not pressed at the trial. Defendant is therefore granted leave to apply on affidavits for an allowance of counsel fees. The amount awarded will,

however, not include the amount deemed by the court to be incurred in the presentation and preparation of the point that plaintiffs were not entitled to relief under Rossiter v. Vogel. It is requested that defendant's affidavit be drawn with that in mind.

The defendant is entitled to judgment declaring it to be the legal owner of the copyright as renewed with costs. I have made certain findings and conclusions at request of defendant but this opinion is intended to embody supplementary ones.