**CAPANO MUSIC, A DIVISION OF BRITONE, INC., Plaintiff,**

**v.**

**MYERS MUSIC, INC., Defendant,**

**Daniel Waldstein, Intervenor,**

**Mollie Goldstein, Intervenor.**

**No. 83 Civ. 8342 (RLC).**

United States District Court,
S.D. New York.

Feb. 5, 1985.

## OPINION

ROBERT L. CARTER, District Judge.

This is a suit for declaratory judgment to determine the successor to Max Freedman's copyright interest in the song, "Rock Around the Clock." Plaintiff and defendant, as well as intervenors Mollie Goldstein and Daniel Waldstein, have moved for summary judgment.

The following facts are not in dispute: Max Freedman and James Myers (a/k/a Jimmy DeKnight) co-authored the song "Rock Around the Clock." The song was published with notice of copyright and registered in the United States Copyright Office on March 31, 1953, by and in the name of Myers Music, Inc. ("Myers Music").

Max Freedman, a resident of Pennsylvania, died on October 8, 1962. He was survived by his widow, Ray Freedman, but left no issue. He left a will, made jointly with Ray Freedman, under which each bequeathed to the survivor "all of [his or her] worldly possessions," except for specific legacies totalling $2,000. The will was duly admitted to probate on February 13, 1964, and Ray Freedman was appointed administratrix *cum testamento annexo* (c.t.a.) of Max Freedman's estate.

On January 9, 1978, Ray Freedman assigned to plaintiff Capano Music ("Capano") her rights in the copyright of "Rock Around the Clock" for $2,000. She died on December 28, 1980, leaving a will which left all her copyright and royalty rights and interests to Mollie Goldstein, her sister. The will was duly admitted to probate on January 5, 1981. Aaron Baer was appointed executor of Ray Freedman's estate.

On January 26, 1981, the copyright in the song was renewed by and in the name of James Myers, the surviving co-author.

That same day, Aaron Baer executed and delivered to Capano a document entitled "Addendum." The "addendum" stated that Baer, as executor of Ray Freedman's estate, "acknowledge[d] approval of the terms and conditions" of the January 9,

Robert W. Cinque, P.C., New York City, for plaintiff.

Burns, Summit, Rovins & Feldesman, New York City, for defendant; Samuel M. Tollen, New York City, of counsel.

Paul M. Wolsk, New York City, for Daniel Waldstein.

Silverman & Shulman, P.C., New York City, for Mollie Goldstein; Alan L. Shulman, New York City, of counsel.

1978 assignment of Ray Freedman's interests in "Rock Around the Clock" to Capano. The document states that Baer was also acting on behalf of Mollie Goldstein, Ray Freedman's sister and legatee, but Goldstein now contends that her consent to the execution and delivery of the addendum was induced by fraud.

On December 28, 1982, intervenor Daniel Waldstein, a nephew of Max Freedman, assigned his interest in the copyright to Capano. Waldstein claimed ownership of the copyright interest through his deceased mother, Ann Freedman Waldstein, who was Max Freedman's sister and sole surviving next of kin.

On May 5, 1983, Baer, the executor of Ray Freedman's estate, was appointed administrator *de bonis non cum testamento annexo* (d.b.n.c.t.a.) of Max Freedman's estate. Two days earlier, Baer (apparently in anticipation of the appointment) had executed a document distributing Max Freedman's interest in the copyright to Mollie Goldstein. He stated that he was doing so as administrator of Max Freedman's estate, pursuant to the bequest made by Max Freedman to Ray Freedman and the bequest made by Ray Freedman to Goldstein. Then, on July 1, 1983, Goldstein assigned her interest in the song to Myers Music in exchange for a $10,000 payment and a guarantee of at least $156,000 in royalties. In a separate document dated the same day, Baer joined with Goldstein in conveying the copyright interest to Myers Music.

At his deposition on February 23, 1984, Baer was notified that the May 3 purported conveyance to Goldstein preceded his actual appointment as administrator of Max Freedman's estate. On May 28, 1984, Baer executed a document purporting to confirm and certify the May 3 transfer.

From this set of facts, the parties suggest three paths along which the copyright interest may have traveled. Waldstein argues that upon Ray Freedman's death, the interest bounced back to Max Freedman's estate and then proceeded through Ann Freedman Waldstein (Max Freedman's next of kin) to Waldstein, and then on to Capano. Capano adopts Waldstein's argument, and argues in the alternative that the interest passed from Max Freedman to Ray Freedman upon the admission to probate of the former's will, and from Ray Freedman to Capano via either the January 9, 1978 assignment or the January 26, 1981 addendum. Myers Music and Goldstein argue that the interest passed from Max Freedman's estate to Ray Freedman, from Ray Freedman's estate to Goldstein, and from Goldstein to Myers Music.

## DISCUSSION

Under the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.*, works which obtained statutory copyright before January 1, 1978, and which did not enter the public domain before that date are protected for an initial term of twenty-eight years. During the twenty-eighth year, the copyright may be renewed for a second term of forty-seven years. § 304(a). If the copyright is not renewed, the work passes into the public domain.

■ In the instant case, "Rock Around the Clock's" first term of protection lasted from March 31, 1953, to December 31, 1981.[1] Max Freedman had assigned his first term interest to Myers Music, in whose name the song was initially copyrighted. There is no dispute about that. Assignment of an author's first term interest, however, does not include assignment of the renewal rights. *Fred Fisher Music Co. v. M. Witmark and Sons*, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943). The only dispute in this case concerns who succeeded to the renewal rights that Max Freedman retained.

■ None of the parties to this litigation actually attempted to renew the copyright. The work did not enter the public domain, however, because James Myers, Max

---

**1.** The term ended in December, 1981, rather than March, 1981, pursuant to § 305, which provides that copyright terms under §§ 302 to 304 run to the end of the calendar year in which they would otherwise expire.

Freedman's co-author, renewed on January 26, 1981. This renewal protected not only Myers' own interests but also the interests of whoever succeeded to Max Freedman's rights as co-author. *Shapiro, Bernstein and Co. v. Jerry Vogel Music Co.*, 221 F.2d 569 (2d Cir.1955); *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 42 F.Supp. 859, 860 (S.D.N.Y.1942) (Leibell, J.), *aff'd*, 140 F.2d 266 (2d Cir.1944).

■ Copyright renewal rights do not pass under the usual rules of testamentary or intestate succession, but rather under the provisions of § 304(a) of the Copyright Act. *See Hill and Range Songs, Inc. v. Fred Rose Music, Inc.*, 570 F.2d 554 (6th Cir.1978). Until the renewal period arrives, the renewal rights are not vested in anyone. The most anyone can claim is a mere expectancy or contingent interest. When the renewal time arrives, the rights vest in one of the four classes of persons listed in § 304(a), according to the circumstances existing at the time of vesting.[2] *Miller Music Corp. v. Charles N. Daniels, Inc.*, 362 U.S. 373, 377–78, 80 S.Ct. 792, 795–96, 4 L.Ed.2d 804 (1960).

Section 304(a) vests the renewal rights in specified designees, in order of priority.[3] *Gibran v. Alfred A. Knopf, Inc.*, 153 F.Supp. 854, 856–57 (S.D.N.Y.1957) (Weinfeld, J.), *aff'd sub. nom. Gibran v. National Committee of Gibran*, 255 F.2d 121 (2d Cir.), *cert. denied*, 358 U.S. 828, 79 S.Ct. 47, 3 L.Ed.2d 67 (1958). First, the rights vest in the author if he or she is alive during the renewal period. Second, if the author is not living, the rights vest in the surviving spouse and children. Third, if the author is not survived by a spouse or children, the interests vest in the executor of the author's will. And, fourth, "in the absence of a will" the rights vest in the author's next of kin.

■ In the instant case, the renewal period commenced on January 1, 1981. Before the vesting date, on January 9, 1978, Ray Freedman had assigned her interest to Capano. At that time, however, all Ray Freedman could assign was a contingent interest. Capano purchased the contingent interest, with the risk that the contingency would not occur. *Miller Music Co. v. Charles N. Daniels, Inc., supra*, 362 U.S. at 377–78, 80 S.Ct. at 795–796. In fact, the contingency did not occur. Ray Freedman died on December 28, 1980, before the renewal rights could vest in her. If the assignor is not living when the renewal rights vest, then those who succeed to the author's interest under § 304(a) take free of any assignment made by the deceased assignor, and the assignee takes nothing. *Id.*; Nimmer, *supra* n. 2, § 9.06[C].

■ On the vesting day, the renewal interests passed under the provisions of § 304(a).[4] Following that section's four-step procedure, the renewal rights could not vest, first, in the author, Max Freedman, because he was not alive at the time of vesting. Second, the rights could not vest in Ray Freedman as Max Freedman's widow because she, too, was not alive when the vesting date arrived. Third, the rights could not vest in the executor or administrator[5] of Max Freedman's estate, because

---

2. The law is unsettled as to precisely when the renewal rights vest. There are three possibilities: (1) at the beginning of the twenty-eighth year (in this case, January 1, 1981); (2) at the time the renewal application is actually filed (in this case, January 26, 1981); or (3) at the beginning of the renewal term (in this case, January 1, 1982). *See* M. Nimmer, Nimmer on Copyright, § 9.05[C]; B. Ringer, "Renewal of Copyright," Copyright Office Study No. 31, at 185–86. The result is the same in this litigation no matter which possibility is chosen, so the court does not reach the question.

3. Section 304(a) states, in pertinent part:

[T]he author of [a] work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his or her next of kin shall be entitled to a renewal and extension of the copyright...

4. Section 304(a) supersedes whatever effect the January 26, 1981 addendum might have had.

5. Administrators c.t.a. stand in the shoes of executors under the Copyright Act. *Gibran v. Alfred A. Knopf, Inc., supra*, 153 F.Supp. at 857.

the administrator was Ray Freedman, and, as noted, she was not living at the time of vesting. *Silverman v. Sunshine Pictures Corp.*, 290 F. 804 (2d Cir.), *cert. denied,* 262 U.S. 758, 43 S.Ct. 705, 67 L.Ed. 1219 (1923). Consequently, the renewal rights passed, fourth, to whoever was Max Freedman's next of kin on vesting day.

Myers Music and Goldstein attack the third link in this chain of reasoning, and contend that the interest must have vested in the executor or administrator of Max Freedman's estate (even though there was none living at the time the interest vested). The interest could not have vested in the next of kin, they argue, because the statute explicitly states that next of kin may take only "in the absence of a will," and here there indisputably was a will. They concede that there was no executor at the time of vesting, but, they contend, the statute says absence of a *will,* not absence of an *executor.*

The Second Circuit faced this issue in *Silverman v. Sunrise Pictures Corp., id.,* and found that there can be an "absence of a will" under the Copyright Act even when the author dies testate. In *Silverman,* the author died in the first term of her novel's copyright protection. She left a will, but neither a widower nor children. Her executors distributed her estate and then were fully discharged before the renewal period began. When the renewal period came, the author's next of kin applied for renewal. The court stated: "We have held, and still think, that the *power* of applying for copyright which springs into existence after the executor's discharge must vest somewhere. It cannot vest in the executor, because there is none; it cannot vest in an administrator d.b.n.c.t.a. for reasons pointed out by us before,[6] and similarly it cannot vest in legatees as such. It must therefore vest in the next of kin. It is true that the rights of the next of kin under the statute arise 'in the absence of a will'; but there is here a complete absence of any will affecting

this renewal copyright." 290 F. at 805 (emphasis in original).

Myers Music and Goldstein argue that *Silverman* is no longer good law, or, at least, that it should be limited to its facts. They base this argument on *Gibran v. Alfred A. Knopf, Inc., supra,* a subsequent copyright succession case in which *Silverman* was held not to control. The argument is unpersuasive. The question faced by the *Gibran* court was whether renewal rights could ever vest in an administrator (rather than in an executor). The *Gibran* district court distinguished *Silverman,* where renewal rights were held not to vest in an administrator, on the ground that in *Silverman* rights could not vest in an administrator only because there was no administrator in office at vesting time. In *Gibran,* there were administrators in office at vesting time, and, the court held, the renewal rights did vest in them. Thus *Gibran* did not disturb the *Silverman* holding that where there is no administrator serving at vesting time the renewal rights vest in the next of kin, and that remains the law in this circuit.

Myers Music and Goldstein also try to distinguish *Silverman* from the instant case. They argue that in *Silverman,* had the court found against the next of kin, the work would have entered the public domain and manifest injustice would have resulted. In the instant case, there is no fear that the work will enter the public domain because James Myers renewed the copyright on January 26, 1981. This is a factual distinction that makes no legal difference. There is nothing in *Silverman* to suggest that the Second Circuit's interpretation of § 24 of the Copyright Act of 1901 (now § 304(a) of the 1976 Act) is to be limited to cases where there is a threat of the work's entering the public domain. The statute itself clearly does not call for one reading of § 304(a) when copyright interests have been safely renewed and another reading when the work may enter the public do-

---

**6.** The reason "pointed out ... before" that the interest could not vest in the administrator was that there was no administrator in office at the time of vesting. *Gibran v. Alfred A. Knopf, Inc., supra,* 153 F.Supp. at 859.

main. The rule in *Silverman* therefore controls in this case, and the renewal rights vested in Max Freedman's next of kin under § 304(a).

 But even if *Silverman* did not control and under § 304(a) the renewal interests vested in the executor of Max Freedman's estate, the result in this case would be the same—Max Freedman's next of kin and not Mollie Goldstein would succeed to the renewal interests. That is because an executor or administrator c.t.a. claims a renewal right not for his own personal benefit but as fiduciary for the benefit of the author's legatees under the will. Nimmer, *supra*, § 9.05[B], citing *Gibran v. Alfred A. Knopf, Inc., supra.* When Baer was named administrator d.b.n. c.t.a. of Max Freedman's estate, he was not given the power to assign the copyright interest to whomever he chose. He was constrained to act as a fiduciary for the benefit of Max Freedman's legatees. But Max Freedman named only his wife as legatee. He named no residuary legatees. He certainly did not name Mollie Goldstein; she was a legatee only under *Ray* Freedman's will. In the absence of residuary legatees in Max Freedman's will, the renewal interest passed under the will as if by intestacy, i.e. to Max Freedman's surviving next of kin. *See In Re Estate of Bickert,* 447 Pa. 469, 290 A.2d 925 (1972).

The court consequently holds that the renewal interest passed to whoever was Max Freedman's next of kin at the vesting time. In a summary judgment motion, the court must take care not to presume facts not properly pleaded by the parties. Capano and Waldstein allege that Ann Freedman Waldstein was "Max Freedman's sister and sole surviving next of kin." (Capano-Waldstein 3(g) Statement ¶ 11). This statement is deemed to be admitted because it was not controverted by either Myers Music or Goldstein. Local Rule 3(g); *Woods v. State of New York,* 469 F.Supp. 1127, 1129 n. 2 (S.D.N.Y.) (Weinfeld, J.), *aff'd mem.,* 614 F.2d 1293 (2d Cir.1979).

However, Capano and Waldstein have not alleged specifically that Ann Freedman Waldstein was Max Freedman's sole surviving next of kin *at the vesting time.* This is not an insignificant omission that the court can overlook: If Ann Freedman Waldstein survived Max Freedman but did not survive until vesting, the renewal rights would not pass to her heirs or assigns.[7] The court therefore can go no further at this juncture than to declare that Max Freedman's renewal rights in "Rock Around the Clock" passed to whoever was Max Freedman's next of kin at the time of vesting.

IT IS SO ORDERED.

---

7. Capano and Waldstein have also failed to allege formally that Daniel Waldstein succeeded to whatever rights Ann Freedman Waldstein might have inherited.