**HILL & RANGE SONGS, INC.**

v.

**FRED ROSE MUSIC, INC. and Broadcast Music, Inc., Robert B. Stewart, Intervenor, Administrator of Estate of Hiriam Hank Williams.**

**Civ. No. 6785.**

United States District Court,
M. D. Tennessee,
Nashville Division.

Oct. 22, 1975.

John S. Clark, Abeles & Clark, New York City, William F. Carpenter and Richard D. Speight, Nashville, Tenn., for plaintiff.

L. Peter Parcher, New York City. Richard H. Frank, Jr., Nashville, Tenn., Robert B. Stewart, Montgomery, Ala., for defendants.

## MEMORANDUM

MORTON, District Judge.

This action was originally brought in the United States District Court for the Southern District of New York, by the plaintiff Hill & Range Songs, Inc., for a declaration of the renewal rights of that company in the United States copyrights of musical compositions by Hank Williams. Pursuant to motions for a change of venue filed by the defendants, the Honorable Irving Ben Cooper, District Judge, entered an order on November 2, 1972, transferring this cause to the Middle District of Tennessee.

Hill & Range Songs claims an interest in the copyright renewal rights for the Hank Williams musical compositions by virtue of an assignment which purported to transfer to it such rights, if any, belonging to Mrs. Billie Jean Berlin of Shreveport, Louisiana. Mrs. Berlin's renewal rights allegedly arose by virtue of her having been married to Hank Williams on the date of his death, January 1, 1953.

Many of the facts pertinent to this controversy were stipulated by the parties in the pre-trial order which was entered by the court. The stipulations of fact found in that order and adopted by the court are as follows:

## THE FACTS

Plaintiff Hill & Range Songs is a duly licensed music publishing company doing business in New York, Nashville,

and other locations. Defendant Fred Rose Music, Inc. is a duly licensed music publishing company doing business in Nashville. Robert B. Stewart, a resident of Montgomery, Alabama, is attorney for, and administrator of, the estate of Hiriam (Hank) Williams, deceased, pursuant to proper orders of the appropriate court in Montgomery, Alabama.

On June 4, 1949, Billie Jean Jones was married to Mr. Harrison Holland Eshliman, from whom she was divorced in 1952. After the death of Hank Williams, she married Johnny Horton on September 26, 1953, in Rusk, Texas. Mr. Horton subsequently died on or about November 5, 1960. She then married her present husband, Keith Berlin, and will be hereinafter referred to as "Mrs. Berlin" or "Billie Jean Berlin."

Mrs. Berlin brought divorce proceedings against Mr. Eshliman in Bossier Parish, Louisiana on September 25, 1952. A hearing was held in that cause on Friday, October 17, 1952. A judgment of divorce was entered by the court on October 28, 1952.

On October 13, 1952, Mrs. Berlin and Hank Williams applied for a marriage license in Louisiana. Then on October 18, 1952, Mrs. Berlin and Hank Williams participated in a civil marriage ceremony before a duly authorized officer in Minden, Louisiana. Following this ceremony, they were issued a certificate of marriage by the State of Louisiana.

On the next day, Mrs. Berlin and Hank Williams participated in two more marriage ceremonies in New Orleans, Louisiana, but these were for the benefit of the public, and no legal consequences flowed from them. They lived together for a period of time in Louisiana. In December of 1952, they went to Montgomery, Alabama. On January 1, 1953, Hank Williams died in West Virginia, while on his way to fill an engagement.

The civil ceremony in Louisiana on October 18 was a nullity because a legal impediment existed at the time of that ceremony which prevented Mrs Berlin from being married in a valid civil cere-

mony. The legal impediment was that her prior marriage to Mr. Eshliman had not yet been dissolved. However, after October 28, 1952, Mrs. Berlin was free to marry, as her divorce from Mr. Eshliman took effect on that date.

Following the death of Hank Williams, litigation was commenced between Mrs. Stone (the mother of Hank Williams), Mrs. Berlin, and Mrs. Audrey S. Williams (the former wife of Hank Williams) in the Courts of Tennessee, Louisiana and Alabama.

On August 19, 1953, Mrs. Berlin, together with Mrs. Stone, Mrs. Audrey Williams, and Jack Norman, Sr., (as guardian for Randall Hank Williams, the only child of Hank Williams), executed an instrument captioned "Agreement Upon Distributive Share of Estate." However, this instrument was not recorded in the Copyright Office until August 16, 1974. In August of 1953, Mrs. Berlin was not cognizant of her rights to the renewal term copyrights of the Hank Williams songs.

Hank Williams was an entertainer and songwriter. During his lifetime he wrote many songs, all of which were assigned to, and copyrighted by, Fred Rose Music or Acuff-Rose Publications, a partnership, and the predecessor in interest of Fred Rose Music, Inc. Hank Williams died before the commencement of the period for renewing any of these copyrights.

Hank Williams had one child by his first marriage, Randall Hank Williams, who performs as Hank Williams, Jr. All of the interests of Randall Hank Williams in the copyrights of the Hank Williams music for the renewal term thereof have been assigned to Fred Rose Music, Inc.

On October 9, 1968, Mrs. Berlin executed an instrument assigning her interest in the renewal copyright terms of the Hank Williams songs to Ernest D. Brookins, individually, and as agent for an undisclosed principal. Thereafter, on February 4, 1969, Mr. Brookins granted an option to Hill & Range Songs, Inc.

to acquire such rights. On May 28, 1969, Mrs. Berlin and Mr. Brookins entered into an assignment of such rights to Hill & Range Songs, Inc. As of the date of the filing of this action, only one song had reached the renewal period, and both Fred Rose Music and Hill & Range Songs applied for the renewal copyright to that song, which is entitled "I'm Praying for the Day Peace Will Come." Broadcast Music, Inc., a music licensing agency, is holding the royalties from that song pending a determination of the validity of the claim of Hill & Range Songs, Inc.

The validity of the assignments of rights to the various parties has not been questioned. From the facts outlined above, five basic issues have arisen:

(1) Was Mrs. Berlin the wife, putative, common-law or both, of the late Hank Williams at the time of his death?

(2) Is either a putative or a common-law wife a "widow" of a deceased writer within the meaning of the Copyright Act, 17 U.S.C.A. § 24?

(3) Does a widow lose her status of widowhood, as this term is used in 17 U.S.C.A. § 24, when she remarries?

(4) Did Mrs. Berlin convey or release her renewal rights when she executed the agreement of August 19, 1953?

(5) Was Mrs. Berlin estopped to assert any interest in the renewal rights by reason of the prior litigation?

The first issue was submitted to a jury after a full fact hearing. In answer to interrogatories submitted by the court, the jury found that Mrs. Berlin was, under applicable Louisiana law, the putative wife of Hank Williams at his death, but not his common-law wife under Alabama law. Plaintiffs filed timely motions for judgment notwithstanding the verdict, seeking to have this court adjudicate as a matter of law that an Alabama common-law marriage existed at the time of Hank Williams' death.

No motion has been filed attacking the propriety of the jury's finding on the issue of putative marriage. A judg-

ment will be entered on that finding, thus leaving only the Alabama common-law marriage issue to be dealt with by the court, with respect to a judgment notwithstanding the verdict.

The second issue was raised prior to the hearing of this cause but subsequent to the pre-trial order, and was submitted to the court upon an agreed set of facts. The third issue and fifth issue were submitted to the court upon agreed facts and stipulated exhibits after having been initially raised by defendants in motions for summary judgment. The fourth issue was also submitted to the court upon agreed facts and stipulated evidence, after having been raised by both plaintiff and defendant in separate motions for summary judgment. All of the motions for summary judgment were taken under advisement prior to the jury trial on the disputed issues of fact and all of these motions will be dealt with by the court in this opinion.

The court now turns to a discussion of each of the five issues outlined above.

## I. WAS MRS. BERLIN THE COMMON-LAW OF HANK WILLIAMS UNDER ALABAMA LAW?

The jury in this cause was asked to decide if Mrs. Berlin was the putative spouse of Hank Williams, according to Louisiana law, at the time of his death. It determined that she was. In addition, the jury was asked to decide if Mrs. Berlin was Hank Williams' common-law spouse, under Alabama law, at the time of his death. It determined that she was not, and in response to this finding the plaintiff filed its motion asking this court to find that Mrs. Berlin was Hank Williams' common-law wife, notwithstanding the jury's verdict.

■ This court believes that this motion filed by plaintiff is well taken. The court has studied the applicable Alabama law and carefully considered the evidence offered at trial, and is of the opinion that the proof unequivocally established an Alabama common-law mari-

tal relationship between Mrs. Berlin and Hank Williams at the time of his death.

■ An examination of the applicable authority reveals that there are two methods for establishing the existence of a common-law marital relationship under Alabama law. The jury was charged by the court concerning both of these. The first method is by showing a present agreement or understanding that the parties are man and wife, followed by cohabitation and public recognition of the relationship in Alabama. *King v. King*, 269 Ala. 468, 114 So.2d 145 (1951); *Murphy v. Jacobs*, 249 Ala. 594, 32 So.2d 306 (1947). The second method is by showing that the parties participated in a void ceremony, void by reason of some impediment, and after the removal of the impediment to the ceremony, they had cohabitated in Alabama and were publicly recognized as man and wife. *King v. King, supra; Barnett v. Barnett*, 262 Ala. 655, 80 So. 2d 626 (1955).

Based upon the facts adduced at the trial and the applicable law as noted above, this court must find as a matter of law that a common-law marriage existed between Mrs. Berlin and Hank Williams under both of the methods mentioned above.

This court charged the jury that in order to find the existence of a putative marriage, the jury would have to find certain facts to be true, as follows:

(1) That Mrs. Berlin and Hank Williams participated in a civil ceremony on October 18, 1952, in Minden, Louisiana, which ceremony was void;

(2) That Mrs. Berlin acted in good faith and believed that the ceremonial marriage was legally valid; and

(3) That Mrs. Berlin's good faith continued until Hank Williams died on January 1, 1953.

In order to find that Mrs. Berlin had good faith, the jury was instructed that they must find as a matter of fact that she honestly and reasonably believed that she was free to marry, that she believed that no impediment existed to prevent her from becoming Mrs. Hank Williams, and that this belief continued until after his death.

By rendering its response in favor of the plaintiff on the putative marriage question, the jury necessarily found these facts to be true. Although the propriety of that finding is not currently under attack, this court notes in passing that there was substantial evidence to support the finding of the jury in this regard.

■ In addition to those facts, certain other undisputed facts emerged from the proof offered at the trial of this cause. In September, 1952, when Mrs. Berlin and Hank Williams participated in the civil ceremony in Minden, Louisiana, this ceremony was a nullity because of a pre-existing legal impediment which prevented Mrs. Berlin from marrying. However, this impediment ceased to exist on October 28, 1952, and after that time she was free to marry. She and Hank Williams lived together in Louisiana until December of 1952, when they went to Alabama. In Alabama they lived together as man and wife.[1] He introduced her and held her out to the public as his wife. He left Alabama on December 31, 1952, for an engagement and died on January 1, 1953.

The proof was completely undisputed that Mrs. Berlin and Hank Williams considered themselves to be man and wife. They lived together as man and wife, and were recognized as man and wife by the public. Plaintiff offered six Alabama witnesses, all of whom agreed that Mrs. Berlin and Hank Williams said that they were married, acted married,

1. It is of no consequence that they lived together in Alabama less than two weeks. There is no established time limit under Alabama law for the cohabitation necessary to create a common-law marriage, all other factors being present. In fact, Alabama courts have found this relationship to exist when the parties cohabitated only "one or two nights." *Smith v. Smith*, 247 Ala. 213, 23 So.2d 605 (1945).

slept together in the same room, and held themselves out to the public as man and wife.

The defendant offered only one witness to the events in Alabama, a lady named Marie Harvell. Even she testified, by deposition, that Hank Williams introduced Mrs. Berlin as his wife, and they lived together in the same house with his mother, sleeping in the same bedroom, in the same bed. This testimony, rather than contradicting plaintiff's proof, supported the existence of a belief on the part of Hank Williams and Mrs. Berlin that they were man and wife, and corroborated plaintiff's Alabama witnesses in their assertion that they lived together as man and wife and held themselves out to the public as such.

There was no evidence offered at trial which tended to show that Mrs. Berlin and Hank Williams did not have an Alabama common law marriage. The fact that the couple may have had family tiffs while they were in Alabama has no bearing on the existence of a common law marriage between them.

Based upon the recited facts, *supra,* and the Alabama law as stated above, this court must find as a matter of law that a common-law marriage materialized between Mrs. Berlin and Hank Williams under both of the above methods. As stated before, the proof clearly established that while they were in the state of Alabama, they had a present understanding or agreement to be man and wife, lived together as man and wife, and held themselves out to the public as the same. Additionally, the parties themselves stipulated that there was a ceremonial marriage which was void because of the existence of an impediment, and that this impediment was removed prior to the time that the two of them moved to Alabama. These stip-

ulated facts, coupled with the undisputed fact that they lived together in Alabama and held themselves out as man and wife, lead this court to the conclusion that a common-law marriage was established as a matter of law.

In passing, this court notes that even if none of the above were true, Mrs. Berlin would still be entitled to all of the benefits of a widow under Alabama law because Alabama would recognize the validity of her rights as established by the law on putative marriage in Louisiana.

■■ The effect of the existence of their putative relationship is set forth by the Supreme Court of Louisiana in the recent case of *King v. Cancienne,* La., 316 So.2d 366 which was handed down by the Supreme Court of Louisiana on June 23, 1975. In that decision the highest Court of the State of Louisiana clearly stated that absent any legal provision to the contrary, "whatever benefit accrues to a legal spouse also accrues to the good faith spouse" of a putative marriage. There is no provision to the contrary in either the law of Louisiana or the law of Alabama. This court finds no authority for the proposition that Alabama would not recognize and protect for Mrs. Berlin the benefits which would have accrued to her by virtue of her Louisiana putative marriage relationship. Indeed, this court believes that under the doctrine of comity the Alabama courts would honor the putative marriage relationship established in a sister state and afford to one in its jurisdiction the benefits which flow from that relationship. *Krug v. Krug,* 292 Ala. 498, 296 So.2d 715 (1974); *Brand v. State of Alabama,* 30 Ala.App. 322, 6 So.2d 442 (1941).[2]

Louisiana recognizes that there is no arbitrary or artificial limitation upon

2. The court recognizes that this might not be the case if Hank Williams had been legally married to another woman at the time of his death. Where a deceased man had both a legal wife and a putative wife at the time of his death, it is likely that Alabama courts would find recognition of the putative wife's status as a widow to be against public policy, because of the overtones of bigamy. However, Hank Williams had no wife other than Mrs. Berlin at the time of his death.

those rights which accrue to the benefit of a putative spouse. Since this principle would be recognized in the State of Alabama, Mrs. Berlin would be entitled under Alabama law to all of the benefits accruing to a legal wife regardless of the outcome of any determination as to her status under the Alabama commonlaw.

## II. IS A PUTATIVE OR COMMON-LAW WIFE A "WIDOW" OF A DECEASED WRITER UNDER THE COPYRIGHT STATUTES?

The parties to this cause submitted this issue to the court for a determination as a matter of law, upon an agreed set of facts, after the issue had been raised by defendants prior to the hearing of this cause, but subsequent to the pretrial order.

■ There is no question that a common-law wife is a "widow" under the Copyright Act, 17 U.S.C.A. § 24. A common-law wife is a valid wife under the law of Alabama in accordance with the authorities hereinbefore cited, and no party to this action has ever contended that a common-law wife would not be a "widow" as that term is used in the Act. This court recognizes that principle as true, and further holds that a putative wife also qualifies as a widow under the Copyright Statute.[3]

The governing principle regarding this issue is established by the case of De Sylva v. Ballentine, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956). That landmark case concerned the right to renew copyrights, and one of the issues was whether an illegitimate child would be a member of the class of "children" as that term is used in the statute. In dealing with this issue the Court dealt also with the proper method for deter-

mining the existence of a "widow" under the Statute:

"To decide who is the widow . . . of a deceased author . . . requires a reference to the laws of the state which created those legal relationships." 351 U.S. at 580, 76 S.Ct. at 980

The Court further narrowed the applicable state law to be consulted in such cases, stating that it "is really a question of the descent of property, . . ." The Court found the controlling question under state law to be whether the person whose status has been questioned would be an heir of the author.

■■ It is not disputed that under Alabama law a common-law wife would be an heir to her husband. This court further finds that under Louisiana law a putative wife would be an heir of her putative spouse. The Courts of Louisiana recognize the right of succession of the putative spouse, and therefore under the authority of De Sylva there is no question but that she qualifies as a person designated to renew under the Copyright Statute.

Any doubt as to the position of the Louisiana Courts on this issue was resolved when the Supreme Court of Louisiana issued its recent opinion in King v. Cancienne, supra. In that decision, the highest Court of Louisiana clearly stated that absent any legal provision to the contrary, "whatever benefit accrues to a legal spouse also accrues to the good faith spouse" of a putative marriage.

"The simple import of the putative spouse provisions of La.C.C. arts. 117 and 118 is to cause civil effects of marriage to flow in favor of the party who marries in good faith and in

3. As noted previously, this would be true whether one looks to Louisiana law or Alabama law to determine the status of a "widow." Even if no Alabama common-law marriage existed, Alabama would recognize the putative wife's status as a widow. However, this holding is limited to the factual situation involved in this case; i. e., one in which there is no competing legal spouse. The court expresses no opinion as to whether a putative wife would qualify in a situation where the deceased had a legal spouse, as well as a putative spouse, at the time of his death.

favor of the children born of that marriage, as though the marriage had been legally consummated. Unless there is legal provision to the contrary, whatever benefit accrues to a legal spouse also accrues to the good faith spouse of a marriage which has been annulled or which is subject to nullity." 316 So.2d p. 371

There being no provision either in Louisiana law or copyright law to the contrary, this court is of the opinion that Louisiana would recognize Mrs. Berlin as an heir of Hank Williams who would succeed to his property at his death, and therefore under the authority of *De Sylva, supra,* she would be a "widow" entitled to renew copyrights under 17 U.S.C.A. § 24.

Even without the *King v. Cancienne* opinion, *supra,* it would appear that the greater weight of authority in Louisiana would have supported Mrs. Berlin's status as an "heir." *Smith v. Smith,* 10 So. 248 (Sup.Ct.La.1891); *Tillison v. Tillison,* 129 So.2d 522 (Ct.App.La. 1951); *Abston v. Abston,* 15 La.Ann. 137 (1860). See also 12 Loyola L.Rev. 118 (1965–66). However, any possible doubt about the issue has been put to rest by the recent pronouncement of the highest Court of Louisiana in the *King* case, *supra.*

### III. DID MRS. BERLIN LOSE HER STATUS AS A "WIDOW" UNDER 17 U.S.C.A. § 24 WHEN SHE RE-MARRIED?

■ In their Motion for Summary Judgment filed herein, the defendants contended that Mrs. Berlin lost her status as a widow when she remarried and is therefore not now a "widow" within the meaning of 17 U.S.C.A. § 24.

That statute, in delineating the succession to the renewal expectancy, does not limit succession to a widow who remains unmarried. The wording is explicit. The court examined the legislative history (H.Rep. 2222, 60th Cong., 2d Sess.), and this examination failed to reveal any evidence of a limiting intent with regard to the term "widow."

This court adopts the holding of the case of *Edward B. Marks Music Corp. v. Borst Music Publishing Co.,* 110 F. Supp. 913 (D.C.N.J.1953). In that case the District Court squarely faced the question of whether the remarriage of an author's wife following the death of the author resulted in a forfeiture of her "widow" status under 17 U.S.C.A. § 24. In its opinion the *Marks* court stated:

"No such restriction is expressed or implied in the wording of the act, nor does any recorded case under. the Act lend support to the theory. Authority to the effect that a woman who remarries retains her status as the widow of her first husband abounds in analogous branches of law." 110 F. Supp. at 918

Defendants have contended that this case was overruled by the *De Sylva* opinion, *supra.* This court believes that *De Sylva* did not overrule *Marks Music v. Borst.* Even though *Marks* was decided before *De Sylva,* the latter opinion neither refers to nor specifically overrules the *Marks* decision. Furthermore, both ordinary usage and public policy requires that this holding be sustained. See Nimmer on Copyright, 1974, § 115.-13.

The term "widow," as this court understands its common usage, is susceptible of two meanings. First it can refer to the woman who is married to a man at the time of his death. Second, it can refer to the present marital status of a female who has been married in the past to a man who is now deceased.

In the first sense it is an identity which attaches to a woman indefeasibly upon the death of her husband. For all time when reference is made to her husband's "widow," that can mean but one person—the woman who was his wife when he died. In the second sense, the meaning may be more transient, since a woman can remarry, at which time she

might not necessarily be referred to as a widow. Nonetheless she would forever remain that person being referred to when one talks about her deceased husband's "widow."

██ This court believes, and so holds, that 17 U.S.C.A. § 24 uses the term "widow" in the first sense, to refer to that woman who was married to the author at the time he died, and who survived him. Her rights are designated by statute, and her identity is indefeasibly established at the moment of the author's death, and her identity as such is not affected by her subsequent remarriage to another man.

For the above reasons this court holds that Mrs. Berlin did not lose her status as a widow under 17 U.S.C.A. § 24 when she remarried. Thus, the Motion for Summary Judgment filed by defendants on this issue must be denied.

IV. DID MRS. BERLIN CONVEY OR RELEASE HER RENEWAL RIGHTS WHEN SHE EXECUTED THE AGREEMENT OF AUGUST 19, 1953?

This issue was raised by all parties to this cause in separate motions for summary judgment. All parties believed, and stipulated to the court, that the facts were uncontradicted, and that the effect of the August 19, 1953 agreement was a matter of law.

As stated before, it was stipulated that on or about August 19, 1953, Mrs. Berlin, together with Mrs. Stone (Hank Williams' mother), Mrs. Audrey Williams (his first wife), and Jack Norman, Sr. (as guardian for Randall Hank Williams), executed an instrument captioned "Agreement Upon Distributive Share of Estate." It has been the contention of defendants that by this agreement Mrs. Berlin transferred or conveyed to the estate of Hank Williams any interest she might have in the renewal rights to the Hank Williams music.

██ In order to determine the effect of the 1953 agreement upon the rights of Mrs. Berlin, this court has researched the applicable decisions in the area of copyright law. The following principles of copyright law are relevant to the case at bar:

1. The right of renewal must be exercised within the 28th year of the original[4] copyright term.

2. The right of renewal is a limited statutory creation, an interest separate from the original term.

3. It is a privilege contingent upon the happening of a contingent future event, sometimes referred to as an expectancy.

4. The beneficiary of this creation, whether the author or others, must be alive during the 28th year of the copyright term. Thus, the identity of the beneficiary is determined during the 28th year.

5. The beneficiary or beneficiaries are specifically defined in the statute as a specific individual or specific individuals.

6. The estate of the author is not designated as a beneficiary and the renewal expectancy, prior to its exercise, cannot be reached by the creditors of the author.

7. If the author dies before the 28th year, the renewal expectancy does not pass to the author or his estate, but by statute passes to the alternate designated statutory beneficiary.

8. The renewal expectancy can be assigned prior to the 28th year, but the assignment is effective only if the successor is alive and the assignment perfected during a portion of the 28th year.

9. The assignee must record the assignment within three months of its execution in order to prevail against the interests of a subsequent assignee for value who records.

---

4. The term original, although technically improper, is used for emphasis.

10. The assignment may be general in nature without specific reference to the renewal privilege.[5] However, circumstances justifying the assignment of the right of renewal must be stronger than those justifying that of the copyright.

See generally: 17 U.S.C.A. § 24; *Miller Music Corp. v. Charles N. Daniels, Inc.,* 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed. 2d 804 (1960); *De Sylva v. Ballentine, supra; Fred Fisher Music Co. v. M. Witmark & Sons,* 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943); *Epoch Producing Corp. v. Killiam Shows, Inc.,* 522 F.2d 737 (2d Cir., 1975); *Siegel v. National Periodical Publications,* 508 F.2d 909 (2nd Cir. 1974); *Edward B. Marks Music Corp. v. Charles K. Harris Music Pub. Co.,* 255 F.2d 518 (2nd Cir. 1958); *G. Ricordi & Co. v. Paramount Pictures,* 189 F.2d 469 (2nd Cir. 1951); *Rossiter v. Vogel,* 134 F.2d 908 (2nd Cir. 1943); *Picture Music Inc. v. Bourne, Inc.,* 314 F.Supp. 640 (D.C.N.Y.1970), and *Rose v. Bourne, Inc.,* 176 F.Supp. 605 (D.C.N.Y.1959), aff'd, 279 F.2d 79 (2nd Cir. 1960).

██ The basic rule as to whether a general assignment or conveyance transfers the contingent expectancy rights of a party is that the trier of facts must determine the intent of the parties. This court must make that determination from the facts which were submitted to it. As previously stated, these facts were submitted to the court in the form of undisputed affidavits and stipulations.

Hank Williams died on January 1, 1953, and left surviving him a widow, the present Mrs. Berlin,[6] and a son, Randall Hank Williams. On January 1, 1953, no copyrights had expired and none had reached the renewal period. At the time of the trial only four songs had reached the renewal stage. The first reached this status in 1971.

After the death of Hank Williams, litigation ensued between Lillian S. Stone (Hank Williams' mother), Mrs. Berlin, and Mrs. Audrey S. Williams (the former wife of Hank Williams). This litigation took place in the Courts of Tennessee, Louisiana and Alabama. Lillian Stone qualified as administratrix of the estate of Hank Williams in Alabama. The Third National Bank qualified as administrator of the estate in Tennessee.

The Third National Bank filed a petition in the County Court of Davidson County, Tennessee, seeking to file a final accounting and discharge. At that time, both Mrs. Berlin and Mrs. Stone sought to qualify as successor under the Tennessee administration.

Thereafter, an instrument dated August 19, 1953, was signed by Mrs. Berlin, Mrs. Stone, Audrey Williams, and Jack Norman, Sr. (as guardian of Randall Hank Williams). It is asserted that by this instrument Mrs. Berlin assigned, released or otherwise gave up her right to renew or participate in the renewal of copyrights to the songs written by Hank Williams, which renewal, as stated before, would not have even become possible until 1971.

At the time of the execution of the August 19, 1953 agreement, Mrs. Berlin "did not know about any rights which she might have to the renewal terms of the copyrights of the Hank Williams songs, nor did she know what a copyright renewal was."[7] The attorneys and other parties to the agreement did not know of the existence of copyright renewals, and did not know that Mrs. Berlin "might ever be entitled to any such interests." In fact, the subject of copyright renewals was never mentioned in the negotiations leading up to the August

---

5. Although there is authority which indicates that a general transfer of the original copyright does not transfer a renewal right, this is generally applied in those cases where there is an assignment of the original copy-

right term and the successor asserts that the renewal term was acquired thereby.

6. The determination of the status of Mrs. Berlin has been discussed hereinbefore.

7. Stipulation, page 3.

19, 1953 agreement, or in the agreement itself.[8]

The agreement is a recitative agreement headed "Agreement Upon Distributive Share of Estate." It begins with a "whereas" clause reciting an agreement between Mrs. Berlin, Jack Norman (as guardian of Randall Hank Williams), and Lillian S. Stone (as administratrix of the estate of Hank Williams), and provides that in return for $30,000.00 to be paid out of the estate to Mrs. Berlin as her "full distributive share as widow, or otherwise, in the estate of Hiriam (Hank) Williams, deceased," Mrs. Berlin agrees to the following:

1. To permit Mrs. Stone to qualify as administratrix in Tennessee.

2. To dismiss court actions in Louisiana and Tennessee.

3. To quitclaim any interest in a horse, saddle, certain song books, luggage and trunks.

4. To execute as the widow of Hank Williams a joint income tax return for 1952 and 1953.

5. To stop making personal appearances as Mrs. Hank Williams.

6. In addition the following language appears in that agreement:

"3. Billie Jean Jones Eshliman Williams, in consideration of this agreement and the payment to her of said portion of the distributable income of said estate, does specifically release, discharge and quitclaim all her rights and interests, of any kind, nature, character, or degree, now existing or which might hereafter at any time arise as widow, surviving spouse, legal wife, common-law wife, or putative wife of Hiriam (Hank) Williams, deceased, in and to any part or portion of the estate of Hiriam (Hank) Williams, deceased, in anything of value owned by Hiriam (Hank) Williams at his death or accruing to his benefit, or for the benefit of his widow, his next-of-kin, his personal representative or to his estate because of or after his death, in either separate or community property real, personal, or mixed, in being or hereafter to come into being, and all and any claims to homestead, dower, widow's allowance or preferances, usufructs, marital portions, year's support, survivorship, or succession rights, or specific exemptions in either specific personalty, general personalty, cash or real property, and including any right to administer the estate of Hiriam (Hank) Williams, deceased, by herself or through others. The foregoing description shall not be in any manner construed as a limitation of the extent of the release of the rights or interests, or claims of rights or interests, of Billie Jean Jones Eshliman Williams in the estate of Hiriam (Hank) Williams, deceased, but are illustrative of her general purpose and intent to accept the above mentioned sum as her full share or interest in said estate, and to renounce every claim of any degree or extent which she might have, or hereafter could assert, in said estate, as the same now exists, or may hereafter be increased in any manner, form, or degree, and from any source.

It is not the intention of this instrument to bind any of the parties hereto regarding their rights, if any, under the Old Age and survivors insurance regulated by the Federal Government but all such rights, if any, shall be determined by the proper agent or agencies of the Federal Government.

7. By the execution of this instrument, it is intended that after the receipt of such sum of Thirty Thousand Dollars ($30,000) said Billie Jean Jones Eshliman Williams will make no further claim, and will have no further claim in and to any property in any form, real, personal, or mixed, contract or chose in action, now constituting or hereafter to constitute in any form a part of the estate of Hiriam (Hank) Williams, deceased."

---

8. Stipulation of March 14, 1975.

In ascertaining whether the parties intended the instrument in question to be a transfer of the contingent expectancy of Mrs. Berlin in the copyright renewals, the court has considered the following to be the pertinent facts:

1. On January 2, 1953, the estate of Hank Williams had no interest in the copyright renewals.

2. On January 2, 1953, the expectancy itself *already belonged to Mrs. Berlin,* and if she were alive in 1971 and thereafter, she could apply for her one-half (½) interest in the renewal terms.

3. On January 2, 1953, the creditors of Hank Williams could not reach the expectancy.

4. The August 19, 1953 agreement was by its own language dealing with the assets of the estate of Hank Williams.

5. The funds ($30,000) paid to Mrs. Berlin had their origin in the Hank Williams estate.

6. The agreement had as its purpose the settlement of claims against the estate of Hank Williams.

7. No wording appears therein dealing with the separate assets of Mrs. Berlin.

8. The agreement makes no provision as to where the allegedly conveyed expectancies were to be vested.

9. Alternatively, if Mrs. Berlin were only releasing them, there is no provision in the agreement as to whether they would exist in a vacuum, be extinguished or accrue to the benefit of another statutory beneficiary.

10. Mrs. Berlin had no knowledge of the existence of, or of her ownership of, the separate contingent rights of expectancy which had been granted her by Congress.

11. The other parties to the agreement did not have this knowledge.

12. The separate interests of Mrs. Berlin were neither mentioned nor discussed during the negotiations which consummated in the execution of the August 19, 1953 agreement.

13. No party to this agreement bothered to record the instrument as an assignment within three months of its execution, as was required by 17 U.S.C.A. § 44.[9]

At the time of the negotiation and execution of the August 19, 1953 agreement, Mrs. Berlin's contingent expectancy was not something which would, in the future, be granted to her by virtue of her interest in the estate of Hank Williams. It was her separate property, something which *already* belonged to her, which became hers prior to the time the agreement at issue was being conceived, negotiated and executed. The August 19, 1953 agreement in no way purports to convey, or even deal with, the separate property of Mrs. Berlin.

 The court is of the opinion that the parties to the August 19, 1953 agreement did not intend to convey, transfer or assign the renewal expectancy. While it may be possible for the possessor of a contingent expectancy in copyright renewals to assign this interest by the use of general language, it must be shown that this is what the parties to the assignment intended. It is patently obvious that Mrs. Berlin could not have intended in the 1953 agreement to convey rights which she did not even know existed.

This court can only conclude that the agreement of August 19, 1953, was not intended to, and thus did not, affect the separate assets of Mrs. Berlin. Her expectancy of renewal to the copyrights was not released, conveyed or assigned by this instrument. Defendants' Motion for Summary Judgment on this issue is therefore denied. Plaintiffs' Motion for Summary Judgment on this issue is granted.

V. WAS MRS. BERLIN ESTOPPED TO ASSERT ANY INTEREST IN THE RENEWALS BY REASON OF PRIOR LITIGATION?

By Motion for Summary Judgment defendants have asserted the defenses of

---

9. This section is now 17 U.S.C.A. § 30. Also, see *Rossiter v. Vogel, supra.*

res adjudicata and collateral estoppel, which are alleged to have arisen by virtue of the judgments entered in three prior civil suits:

*Mrs. Hank Williams v. Audrey Williams,* No. 16171 in the United States District Court for the Middle District of Tennessee, Nashville Division, filed May 15, 1953, hereafter referred to as the Nashville case;

*Mrs. Hank Williams v. Audrey Mae Shepard,* No. 321–696 in the Civil District Court for Orleans Parish, Louisiana, filed April 9, 1953, hereafter referred to as the New Orleans case; and

*Billie Jean Williams Berlin v. Metro-Goldwyn-Mayer, Inc.,* No. 12,181, in the United States District Court for the Northern District of Georgia, Atlanta Division, judgment entered March 9, 1972, hereafter referred to as the Atlanta case.

Pertinent portions of the records in those actions were stipulated and submitted to the court. Based on its analysis thereof, this court finds that the defenses of res adjudicata and collateral estoppel are without merit.

An analysis of the complaint filed in the Nashville case reveals that Mrs. Berlin asserted that as the wife of Hank Williams she was entitled to certain royalties which had accrued and were accruing from the original copyrights perfected during the life of Hank Williams, and which were an asset of his estate.

The complaint filed in the New Orleans case by Mrs. Berlin sought an injunction against Audrey Mae Shepard Williams, who had been divorced from Hank Williams, to enjoin the former wife from using as her name "Mrs. Hank Williams" in the singing and entertainment profession. As noted hereinbefore in the "Agreement Upon Distributive Share of Estate," Mrs. Berlin "as widow, surviving spouse, legal wife, common-law wife,

or putative wife of Hank Williams, deceased" released any claim against the estate of Hank Williams, and also agreed to dismiss the Nashville and New Orleans cases, *supra.* Upon application of Mrs. Berlin, these cases were dismissed with prejudice.

The Atlanta case was an attempt by Mrs. Berlin, as the widow of Hank Williams, to recover from Metro-Goldwyn-Mayer, Inc., Columbia Broadcasting System and Storer Broadcasting Co. for an alleged libel arising from a telecast of the movie "Your Cheatin' Heart." The judgment reflected a jury determination that Mrs. Berlin was the common-law wife of Hank Williams, deceased, but was not his putative wife at the time of his death on January 1, 1953.

Defendants contend that the issues in the instant case, particularly the issue of the marital status of Mrs. Berlin at the time of Hank Williams' death, are barred from re-litigation because of their having been previously litigated in the above described cases, under the doctrines of res adjudicata and collateral estoppel.

The issue of the application of the doctrine of res adjudicata is easily disposed of.

That doctrine clearly does not apply as to any of the above cases. The doctrine of res adjudicata has been clearly defined by the Sixth Circuit in *Harrison v. Bloomfield Building Industries, Inc.,* 435 F.2d 1192 (6th Cir. 1970), as barring "a second suit between the same parties and their privies on the same cause of action as to all issues which were or could have been litigated in the former suit, . . ." 435 F.2d at 1195.

Only by the most strained logic could one conclude that this present action to establish rights under the copyright law is the "same cause of action" as any of the three suits in which Mrs. Berlin was previously involved.

Additionally, the parties to the instant suit are not the same as the parties to any of the other actions, nor are the parties here all privies to parties in those cases. The essence of res adjudicata is the prevention of a second suit between the parties on the merits of a cause of action when the issues have been disposed of in an earlier action. Thus, that doctrine has no application in the instant situation.

■■■ This court is equally convinced that the doctrine of collateral estoppel does not apply as to any of the above described cases, but before dealing specifically with that issue, it is important to consider the effect of its possible application as suggested by defendants.

In essence, defendants take the position that the issue of Mrs. Berlin's marital status at the time of Hank Williams' death was litigated in one or more of the prior cases to which she was a party, and that if there was an adverse decision on that issue in any of those cases, she would be "bound by that decision and precluded from re-litigating it in this case."

As stated before, and for reasons which will be hereinafter shown, this court does not believe that collateral estoppel has any application here. However, even if it did, it could *only* apply to the putative marriage issue. This court has carefully examined the records of the prior cases as furnished by counsel, and has found that the only occasion when Mrs. Berlin's marital status was actually at issue or litigated was in the Atlanta case. The jury's verdict there was adverse to her interest on the putative marriage issue, but the jury found that she *was* Hank Williams' common-law wife under Alabama law at the time of his death.

■■■ The proposition is well established that collateral estoppel applies only to bar the re-litigation of issues that were decided adversely to the interests of the parties seeking to re-litigate them, and this needs no citation of authority. Therefore, even if this doctrine did apply in this case, which it does not, it would only bar re-litigation of the putative marriage issue.

The net result of this is that since this court has found as a matter of law that Mrs. Berlin was Hank Williams' common-law widow in Alabama, *supra*, then the application of this doctrine, if sustained, would not alter this court's ultimate determination as to the rights of Mrs. Berlin. However, collateral estoppel does not apply here. This court has carefully examined the cases of *Humphreys v. Tann et al.*, 487 F.2d 666 (6th Cir. 1973); *Tyler v. E. I. DuPont*, 443 F.2d 125 (6th Cir. 1971); and *Harrison v. Bloomfield Building Industries, supra,* and holds that these cases do not require or support the application of that doctrine in the instant case. Additionally, although the validity of Mrs. Berlin's Louisiana putative marriage was a jury issue in the Atlanta litigation, estoppel does not apply because a determination of that issue was not necessary to the judgment subsequently entered.

■■■ It has long been the law that in order for a judgment to bar litigation of an issue in a subsequent suit under the doctrine of collateral estoppel, it is not only necessary that the issue have been decided in the first place, but the decision of that issue must have been necessary to the judgment itself. *Cromwell v. County of Sac*, 94 U.S. 315, 24 L.Ed. 195 (1877); *United Shoe Machinery Corp. v. United States*, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922). See, also, Moore's Federal Practice, par. 0.441(1).

■■■ It is not sufficient that an issue was joined in the prior litigation and a verdict rendered on that issue, if the judgment finally entered by the court was such that the issue involved was not a determinative issue with regard to that judgment. *Diplomat Electric Co.,*

*Inc. v. Westinghouse Electric Supply Co.*, 430 F.2d 38 (5th Cir. 1970); *Fibreboard Paper Products Corp. v. East Bay Union of Machinists Local 1304*, 344 F.2d 300 (9th Cir. 1965); See, also, Moore's Federal Practice par. 0.443(5).

Applying this doctrine to the Atlanta litigation, it can be seen that a determination of the validity of the Louisiana marriage was not necessary to, or determinative of, the judgment entered by the Court in the Atlanta litigation. The jury found that there was libel, but no malice, hence judgment was entered for the defense. In order to find that there *was* libel, the jury had to find that Mrs. Berlin was Hank Williams' wife, and they did so by finding that Mrs. Berlin was the common-law wife of Hank Williams. Thus, a finding that she was *not* his putative wife was surplusage, having no bearing upon the judgment itself. Therefore, under the authorities heretofore cited, the doctrine of collateral estoppel should not be applied to that issue to bar re-litigation of it in a subsequent case.

As to the Nashville and New Orleans cases, the doctrine of collateral estoppel is not applicable. *Harrison v. Bloomfield Building Industries, Inc., supra,* reiterates the principal that estoppel prevents re-litigation of any matters which were "actually litigated and determined" in prior litigation. 435 F.2d at 1195. This doctrine does not apply to either the Nashville or the New Orleans case because in neither of those cases was there a determination of the marital status of Mrs. Berlin, nor was one requested.

The original petition filed by Mrs. Berlin in the Nashville case alleged that prior to Hank Williams' death Audrey Williams had been entitled to the payment of alimony from Hank Williams, and that this right was terminated by his death. The petition prayed for a determination of Mrs. Berlin's interest in the proceeds of contracts Hank Williams had executed with Acuff-Rose and a declaration that Audrey Williams' interest had been terminated prior to Hank Williams' death. The issue of Mrs. Berlin's marital status was never joined. Audrey Williams filed a motion to dismiss attacking the jurisdiction of the Nashville Court to adjudicate the issue of her status, stating that the issue was one for the state probate court to decide. Upon motion of Mrs. Berlin the case was dismissed with prejudice. At most, the only matters at issue were jurisdiction of the Court, the right of Audrey Williams to collect money from Acuff-Rose, and the right of Mrs. Berlin to share in that money.

In the New Orleans case, Mrs. Berlin sought to enjoin Audrey Williams from billing herself professionally as Mrs. Hank Williams, and asked for damages resulting from Audrey Williams continued use of that name. The only parties to that suit were Mrs. Berlin and Audrey Williams. Audrey Williams filed technical pleadings, taking exception to the service of process, to Mrs. Berlin's failure to choose one marriage theory, to Mrs. Berlin's suing under the name of "Mrs. Hank Williams," and to the suit being brought against her in her maiden name. All of these "exceptions" addressed themselves to technicalities in the pleadings and process. They were the civil law equivalents of motions to quash service, and motions to dismiss. Audrey Williams never filed a plea to the merits, and the issue of Mrs. Berlin's status was never joined. The only "issues" determined by the order of dismissal were the issues raised by Audrey Williams in her exceptions.

It is clear that no determination was made by the Nashville or New Orleans Courts of the marital status of Mrs. Berlin, and no such determination was ever requested. Consequently, there is no "judgment" on that issue arising from those actions which can be used to estop the plaintiff in the instant case.

The court notes with interest that Mrs. Berlin asserted in all of these cases

that she is the widow of Hank Williams. She has never taken an inconsistent position.

After a careful examination of the prior litigation and the applicable authority, the court can only conclude that the elements of the doctrines of res judicata and collateral estoppel are not present, and those doctrines do not apply in the instant situation. Accordingly, the defendants' Motion for Summary Judgment in this regard is overruled.

## SUMMARY

In summary, then, this court finds and holds that at the time of Hank Williams' death on January 1, 1953, Mrs. Billie Jean Berlin was both his common-law spouse under Alabama law and his putative spouse under Louisiana law, that Alabama would give recognition to her as a putative spouse, and that as such she was his "widow" within the meaning of that term as used in 17 U.S.C.A. § 24. As his widow, she has the right to apply for the renewal of the copyrights in his music, to the extent of her one-half interest. She did not lose that right when she remarried, and she did not convey, assign or transfer that right when she signed the January 19, 1953 agreement.

The plaintiff, Hill & Range Songs, as her assignee, now has that right. As to those songs for which the twenty-eighth year of renewal term has already commenced, the applications for renewal filed by Hill & Range are valid and should be honored, to the extent of Mrs. Berlin's interest. As to Hank Williams' other compositions, so long as Mrs. Berlin is alive at the time she is statutorily permitted to renew each succeeding composition, Hill & Range may apply as her assignee to renew those compositions together with the assignee of the interest of Hank Williams, Jr., Fred Rose Music.

Counsel for the plaintiff Hill & Range Songs, Inc. will prepare and submit an order in accordance with this memorandum.